UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                                    :
MARK YOUNGERS, *et al.*, *individually and on*
*behalf of all others similarly situated,*          :

                          Plaintiffs,     :        15cv8262

                    -against-             :        OPINION & ORDER

                                                    :
VIRTUS INVESTMENT PARTNERS INC., *et al.*,
                                                    :
                          Defendants.
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

      Lead Plaintiffs Mark Youngers, et al. ("Plaintiffs"), bring this securities class

action on behalf of themselves and others who purchased various mutual funds issued by Virtus

Opportunities Trust ("Virtus Trust") between May 8, 2010 and December 22, 2014.  Plaintiffs

also bring shareholder derivative claims under Delaware law.  Defendants Virtus Investment

Partners, Inc. ("Virtus Partners"), et al., move to dismiss the Second Amended Class Action

Complaint ("Complaint").  Defendants' motions to dismiss are granted in part and denied in part.

## BACKGROUND

      The allegations in the Complaint are presumed to be true for purposes of this

motion.  In 2008, defendant Howard Present, founder of defendant F-Squared Investments, Inc.

("F-Squared") began to market an investment strategy called AlphaSector.  Present claimed that

AlphaSector had outperformed the S&P 500 index over the long term and avoided most of the

investor losses stemming from the 2002 bear market and the 2008 financial crisis.  (Complaint

¶ 4.)  But AlphaSector was not created until 2008, when the algorithm for that strategy was

formulated by a 20-year old college intern.  (Complaint ¶ 4.)  To conceal this fact, F-Squared ran

a simulation called a "back-test" showing how the strategy would have performed between 2001 and 2008 had it been in existence.  (Complaint ¶ 4.)  The back-tested results were reported as if they were achieved through live trading with real client assets in two indices: the AlphaSector Rotation Index and the Premium AlphaSector Index (the "AlphaSector Indices" or the "Indices").  (Complaint ¶ 51.)  A comparison of the Indices to the S&P 500 showed great results for the AlphaSector strategy.  For instance, between 2001 and 2010, the AlphaSector Premium Index purportedly returned 198%, while the S&P 500 only returned 13.5%.  (Complaint ¶ 55.)

In 2009, Present pitched the AlphaSector strategy to Virtus Partners, the parent company of Virtus Trust's investment adviser, Virtus Investment Advisers, Inc. ("Virtus Advisers"), claiming that it had "consistently outperformed the benchmark S&P 500 since its inception in April, 2001."  (Complaint ¶ 48.)  Later that year, Virtus Advisers retained F-Squared as a sub-adviser, and Virtus Trust offered two mutual funds: the Virtus Dynamic AlphaSector Fund and the Virtus AlphaSector Rotation Fund.  As a result of the initial success of those mutual funds, Virtus Trust offered three more: the Virtus Premium AlphaSector Fund (July 2010), the Virtus Allocator Premium AlphaSector Fund (March 2011), and the Virtus Global Premium AlphaSector Fund (March 2011).  (Complaint ¶ 56.)

From January 2010 until October 2013,[1] every post-effective amendment to Virtus Trust's registration statements contained a chart comparing the AlphaSector Indices to the S&P 500 index.  In a footnote that accompanied the chart, Virtus Trust announced that "[t]he Index inception date is April 1, 2001; it commenced daily calculation and dissemination by NASDAQ OMX with a base value 1,000.00 on October 13, 2008."  (Complaint ¶¶ 69–76.)

_____

[1] Virtus Trust stopped publishing the AlphaSector Indices in the post-effective amendments to the registration statements on October 4, 2013.  (Complaint ¶ 92.)

Early on, Virtus Partners received credible intelligence that the AlphaSector Indices contained back-tested information.  For instance, in November 2009, the Financial Industry Regulatory Authority ("FINRA") notified Virtus Partners that the performance history of the AlphaSector Rotation index, prior to October 13, 2008, was back tested.  (Complaint ¶ 58.a.)  And beginning in 2011, market participants also alerted Virtus Partners to the back testing.  Despite this information, Virtus Partners took no steps to ascertain whether the strategy had been used in any real-time trading between April 2001 and September 2008.  (Complaint ¶ 57–58.)

In December 2012, during a conference in Boca Raton of Virtus Partners' wholesalers, Present touted AlphaSector's returns and performance record, noting that "the AlphaSector Premium Index is based on an active strategy with an inception date of April 1, 2001.  Inception date is defined as the date as of which investor assets began tracking the strategy." (Complaint ¶ 62.)  After Present addressed the conferees, Virtus Advisers' product manager cautioned the wholesalers to disregard Present's claim that AlphaSector's performance was based on a live strategy going back to 2001 because the strategy was only developed in 2008, and pre-2008 returns were based on back-tested, hypothetical assets.  (Complaint ¶ 63.)

In July 2013, the SEC initiated an investigation into F-Squared and AlphaSector's performance history.  In the wake of the investigation, Virtus Trust excised the portion of its registration statement that discussed AlphaSector's pre-2008 track record without making any corrective disclosure.  Shortly thereafter, Aylward (and other non-defendants) organized a conference call, telling Virtus employees to destroy any materials they had relating to AlphaSector's track record.  (Complaint ¶ 64.)  In December 2013, *The Wall Street Journal*

reported that F-Squared was "under scrutiny" because its marketing materials reflected

theoretical performance, not actual investor returns.

In November 2014, Present resigned from F-Squared.  (Complaint ¶ 80.)  The

next month, F-Squared admitted to violating the securities laws and settled with the SEC for $35

million in disgorgement and civil monetary penalties.  (Complaint ¶ 82.a.)

In May 2015, Plaintiffs filed this securities class action asserting claims under

Sections 10(b) and 20(a) of the Exchange Act of 1934, Rule 10b-5 promulgated thereunder,

Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, and claims for breach of fiduciary

duty under Delaware law.  Concurrently, Virtus Partners announced that the SEC had initiated an

investigation into Virtus Advisers and AlphaSector's performance history.  In November 2015,

Virtus Advisers consented to entry of a cease and desist order and settled with the SEC for $16.5

million in disgorgement and civil monetary penalties.  (See Complaint ¶ 57.)

The Virtus Defendants,[2] Independent Trustees,[3] Present, and F-Squared[4] move

separately to dismiss the Complaint.

## LEGAL STANDARD

To withstand dismissal, a pleading "must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556

U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

Courts must accept as true all well-pleaded factual allegations.  See Hooks v. Forman, Holt,

---

[2] The Virtus Defendants are comprised of Virtus Partners, Virtus Advisers, Virtus Trust, Euclid Advisors, LLC ("Euclid"), VP Distributors, LLC ("VP Distributors"), George R. Aylward, Michael A. Angerthal, W. Patrick Bradley, Francis G. Waltman, Mark S. Flynn, and Amy Robinson.

[3] The Independent Trustees are Leroy Keith Jr., Philip R. McLoughlin, Geraldine M. McNamara, James M. Oates, Richard E. Segerson, and Ferdinand L.J. Verdonck.

[4] The F-Squared Defendants are F-Squared Investments, Inc., F-Squared Alternative Investments, LLC, F-Squared Institutional Advisors, LLC, and F-Squared Investment Management, LLC.  F-Squared is in bankruptcy and obtained relief from the automatic stay to file its motion to dismiss in this action.

Eliades & Ravin, LLC, 717 F.3d 282, 284 (2d Cir. 2013).  In addition, a court may consider

"legally required public disclosure documents filed with the SEC" as well as documents

"incorporated into the complaint by reference" or relied upon by the plaintiff "in bringing suit."

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).  However,

"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice."  Iqbal, 556 U.S. at 678.

Under Fed. R. Civ. P. 9(b), a securities fraud complaint must satisfy heightened

pleading requirements, "stating with particularity the circumstances of fraud."  Employees' Ret.

Sys. Of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 304 (2d Cir. 2015) (citation

omitted).  In addition, securities fraud claims are subject to the "[e]xacting pleading

requirements" of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Tellabs, Inc.

v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007), which provides that a complaint shall

state with particularity "all facts on which [the] belief [that a statement is misleading] is formed,"

15 U.S.C. § 78u4(b)(1)(B), and "facts giving rise to a strong inference that the defendant acted

with the required state of mind," 15 U.S.C. § 78u–4(b)(2)(A).

DISCUSSION

I.      Standing

As a preliminary matter, Defendants assert that Plaintiffs lack standing to pursue

claims on behalf of the shareholders of two of the five funds—the Allocator Premium

AlphaSector Fund and the Global Premium AlphaSector Fund—because Plaintiffs never purchased

shares in these funds.

The Second Circuit has held that a plaintiff may pursue claims on behalf of a

putative class of investors for securities that he did not purchase if he alleges both Article III

standing and class standing.  NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.,

5

693 F.3d 145, 162 (2d Cir. 2012).  In the context of class actions, Article III standing requires

that "for every named defendant there must be at least one named plaintiff who can assert a

claim directly against that defendant."  NECA, 693 F.3d at 159.  If that requirement is satisfied,

the inquiry shifts to a class standing analysis.  NECA, 693 F.3d at 159.

    Class standing requires that the conduct allegedly causing Plaintiffs' Article III

loss "implicates the same set of concerns as the conduct alleged to have caused injury to other

members of the putative class by the same defendants."  NECA, 693 F.3d at 162.  Where the

alleged injury is based on misrepresentations, "the misconduct alleged will almost always be the

same," but "[w]hether that conduct implicates the same set of concerns . . . will depend on the

nature and content of the specific misrepresentation alleged."  NECA, 693 F.3d at 162.  For

example, in NECA, plaintiffs brought class claims on behalf of purchasers of mortgage-backed

certificates that they themselves had not purchased.  However, each of the certificates at issue in

NECA shared the same shelf registration statement containing misstatements about the

underwriting guidelines for the loans backing the certificates.  The Second Circuit found that

unpurchased certificates issued from offerings that were backed by loans from different

originators than the purchased certificates did not share the "same set of concerns" because the

"alleged injuries . . . could turn on very different proof," i.e., "whether the particular originators

. . . had in fact abandoned [their] underwriting guidelines . . . ."  NECA, 693 F.3d at 163.  But

because certificates backed by loans from the same originators shared the same set of concerns,

the NECA plaintiffs had class standing to assert claims for those certificates even if no plaintiff

had purchased that particular certificate.  NECA, 693 F.3d at 164.

    Here, the alleged misstatements are contained in a registration statement common

to all of the funds.  Defendants assert that only two funds track the AlphaSector Indices in the

appendices containing the misleading footnote: the Virtus AlphaSector Rotation Fund and the

Virtus Premium AlphaSector Fund.  Further, Defendants maintain that each of the five

AlphaSector funds follows a different investment strategy and that any alleged injury "could turn

on very different proof."   But, regardless of a particular fund's <u>investment</u> strategy, the

Complaint alleges that each fund implemented the same <u>marketing</u> strategy, in which the

performance history of the funds was a "crucial selling point."  (<u>See</u> Complaint ¶ 60

("Wholesalers were 'instructed to show what the funds did in 2001 to 2008' and emphasize that

they 'dramatically outperformed the S&P 500.'").)  The allegedly misleading statements in the

AlphaSector Indices bolster the AlphaSector brand, which permeates every AlphaSector Fund.[5]

Accordingly, the funds share the same set of concerns and Plaintiffs have class standing to

pursue their claims against each fund.[6]

> II.     <u>Section 10(b) of the Exchange Act and Rule 10b-5</u>

> The Complaint alleges that Aylward, Bradley, and the Independent Trustees

violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5.

To maintain claims under Section 10(b) and Rule 10b-5, "a plaintiff must prove (1) a material

misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the

misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation."  <u>Pac. Inv. Mgmt. Co.</u>

---

[5] Similarly, "[t]urning to the question of tranche-level standing, [this Court does] not believe the Certificates' varying levels of payment priority raise such a 'fundamentally different set of concerns' as to defeat class standing."  <u>NECA</u>, 693 F.3d at 164 (citation omitted).

[6] Present argues that Youngers lacks statutory standing because he neither purchased nor sold fund shares, but was instead merely a "holder."  However, the Complaint's allegations that Youngers' spouse purchased shares of the funds during the class period and then assigned all rights to Youngers suffice.  (Complaint ¶ 16.)  <u>See</u> <u>W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP</u>, 549 F.3d 100, 108 (2d Cir. 2008) ("[A]n assignment of claims transfers legal title or ownership of those claims and thus fulfills the constitutional requirement of an 'injury-in-fact.'").

LLC v. Mayer Brown LLP, 603 F.3d 144, 151 (2d Cir. 2010).  The parties dispute whether the Complaint adequately alleges loss causation, scienter, or a misstatement or omission of material fact.

> A.   *Loss Causation*

Loss causation is akin to the "tort-law concept of proximate cause," Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 197 (2d Cir. 2003), and is defined as the "causal connection between the material misrepresentation and the loss," Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 342 (2005).  "[T]o establish loss causation, a plaintiff must allege . . . that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005).

Defendants' loss causation argument focuses on the method by which the Virtus Trust funds' share price is calculated.  Pursuant to SEC regulations, the price of mutual fund shares is calculated according to the funds' net asset value ("NAV").  The NAV is calculated as the value of the funds' underlying assets (e.g., interests in other securities) minus liabilities (e.g., management fees) divided by the number of shares.  See 17 C.F.R. §270.2a-4; In re State St. Bank & Trust Co. Fixed Income Funds Inv. Litig., 774 F. Supp. 2d 584, 591 (S.D.N.Y. 2011) ("NAV was calculated . . . according to the following formula: (Assets–Liabilities)/Number of Shares.").  Because Defendants' statements cannot affect the value of the underlying assets (what a Virtus Trust executive says about AlphaSector would not affect the price of, for example, Google stock), their statements cannot affect the NAV.  Therefore, Defendants reason, their statements cannot affect the value of the Virtus Trust shares and could not cause the losses alleged in the Complaint.

8

Although Defendants are correct that statements by mutual fund executives generally do not affect the NAV,[7] it is not clear that the NAV is the only measure of value for mutual fund shares.  See In re Oppenheimer Rochester Funds Grp. Sec. Litig., 838 F. Supp. 2d 1148, 1177 (D. Colo. 2012) (declining to dismiss action where there remained "complex legal and factual determinations, including whether NAV is the sole reflection of 'value' for purposes of determining damages in §§ 11 and 12(a)(2) cases"); Mercer E. Bullard, Dura, Loss Causation, and Mutual Funds: A Requiem for Private Claims?, 76 U. Cin. L. Rev. 559, 575 (2008) ("[A] fixation on a mutual fund's share price as the only measure of its value ignores the myriad ways the value of a mutual fund can be misrepresented.").  But see In re State St., 774 F. Supp. 2d at 591 (dismissing Securities Act claims for lack of loss causation because NAV of mutual fund was determined by statutory formula and "alleged misrepresentations regarding a fund's investment objective and holdings . . . can have no effect on a fund's share price.").  Equating price and value for securities traded on an open market makes sense where "the value of the stock is worth the market price."  Basic Inc. v. Levinson, 485 U.S. 224, 244 (1988).  But here, as Defendants point out, the mutual fund shares are not traded on a secondary market.  Rather, the mutual fund shares are priced according to a statutory calculation.  Under such circumstances, the price of the shares does not necessarily reflect their value.

In situations where a change in value is not necessarily represented by a corresponding change in price, a court must shift its focus to something other than price in determining whether a misstatement "negatively affected the value of the security."  Lentell, 396 F.3d at 173 (emphasis added).  Such a valuation process is neither onerous nor exceptional;

---

[7] In certain instances, the statements can relate directly to the NAV.  See, e.g., Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC, 595 F.3d 86, 96 (2d Cir. 2010) (finding "the periodic deduction of [misstated transaction] fees and expenses reduced the value of the investments over time").

investors make an independent determination of value each time they purchase a mutual fund share.  Indeed, it is an axiom of microeconomics that a party will not purchase an item if its value does not exceed its price.  With securities, investors consider the expected future value of an investment and purchase securities when the discounted present value exceeds the price.  To make this assessment, investors look to a myriad of factors, which, for example, can include risk and performance history.  A material misrepresentation of any of these factors could lead to an inflated valuation of the security.

    With this in mind, it becomes apparent that the Complaint adequately pleads—for the purposes of a motion to dismiss—a plausible theory of loss causation.  The Complaint asserts that one of the key factors investors used to value the Virtus Trust funds was the performance history.  (Complaint ¶ 60 ("[T]he track record of the AlphaSector Funds was the crucial selling point of the funds.").)  The Complaint further alleges that performance history of the AlphaSector Indices was misleading because it failed to indicate that the results were back tested.  (Complaint ¶ 52.)  Because the performance history was misrepresented, the valuation of the Virtus Trust funds was inflated.  (Complaint ¶ 121 ("[The back-tested results] demonstrated that the AlphaSector strategy could outperform the S&P 500 in general and particularly at times of economic crisis [and] caused Plaintiffs to invest in . . . the Virtus mutual funds.").)  The inflated valuation was demonstrated throughout the life of the funds as they experienced "substandard performance."  (Complaint ¶ 161.)  Over time, "the AlphaSector funds began to decline in value," and eventually, the Virtus Trust fund shares "were greater in price at the time of purchase than . . . the value of the respective funds on the date that the Complaint was filed."  (Complaint ¶ 123.)  In sum, the Complaint asserts allegations that the back-tested nature of the indices artificially inflated the value of the Virtus Trust funds and, when that valuation proved to

be false, Plaintiffs lost the difference between the inflated value at the time of the purchase and the true value.[8]  Accordingly, Plaintiffs alleged that the registration statements "concealed something from the market that, when disclosed, negatively affected the value of the security." Lentell, 396 F.3d at 173.

        The Complaint also adequately alleges an alternative theory of loss causation pertaining to a direct loss in NAV.  The Complaint alleges that the investors paid higher fees than they otherwise would have if they had known that the performance history of the AlphaSector Indices was back tested.  (Complaint ¶ 124.)  The higher fees were deducted from the funds' assets, which, in turn, directly "result[ed in a] diminution of their investment's asset value."  In re AIG Advisor Grp., 2007 WL 1213395, at *11 (E.D.N.Y. Apr. 25, 2007).  For that reason, Plaintiffs have adequately pled loss causation resulting from inflated management fees.

        B.  *Material Misstatement or Omission*

        To properly plead a claim under the Exchange Act, the Complaint must plead that the defendant "made an untrue statement of a material fact[,] or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading."  15 U.S.C. § 78u–4(b)(1).  Defendants challenge both the misleading nature and the materiality of the AlphaSector Indices.  Defendants claim that the statements were not misleading when read in context and, even if the statements were misleading, they were not material with regard to the three funds that do not specifically track either index.

---

        [8] Damages calculations are also possible in such situations.  In a portfolio mismanagement case, the Second Circuit found that "[t]he proper method of determining damages is to take the initial value of the portfolio, adjust it by the percentage change in an appropriate index during the aiding and abetting period, and subtract the value of the portfolio at the end of the period."  Rolf v. Blyth, Eastman Dillon & Co., 637 F.2d 77, 84 (2d Cir. 1980).  A similar method could be appropriate here.

1.   Misleading Statements

To satisfy the pleading requirements of the PSLRA and Rule 9(b), "the complaint [must] specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." Rombach v. Chang, 355 F.3d 164, 172 (2d Cir. 2004) (quoting 15 U.S.C. § 78u–4(b)(1)).  In evaluating whether a statement is misleading, "[t]he literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context." In re ProShares, 728 F.3d 96 at 105.  For instance, in In re ProShares, the Second Circuit found that tables listing investment costs in a prospectus were not misleading "when placed in context" because the defendants disclosed that certain fees were "for illustration purposes only" and "not meant to suggest actual . . . fees or returns." In re ProShares, 728 F.3d at 105–06.

Here, the Complaint rests on a single misstatement.[9]  The appendices attached to certain Virtus Trust registration statements contain the AlphaSector Indices and compare them to the S&P 500.  (Complaint ¶¶ 68–78.)  The Indices contain a footnote that states, "[t]he Index inception date is April 1, 2001; it commenced daily calculation and dissemination by NASDAQ OMX with a base value 1,000.00 on October 13, 2008 [for the Rotation Index or January 3, 2011 for the Premium Index]."  (Complaint ¶¶ 68–78.)  The Complaint alleges that these statements were misleading for failing to disclose that the Indices "were not developed until October of 2008, that the AlphaSector strategy was not used to manage real assets prior to October 2008, and that the represented results prior to October 2008 were back-tested."  (Complaint ¶ 77.)

---

[9] The Complaint also makes reference to purported misstatements in a September 30, 2009 Virtus Trust shareholder report, but such statements are not actionable, as they pre-date the putative class period.  See In re Int'l Bus. Machines Corp. Sec. Litig., 163 F.3d 102, 107 (2d Cir. 1998) ("A defendant . . . is liable only for those statements made during the class period.").

Defendants claim that the statement explaining that the index "commenced daily calculation and dissemination by NASDAQ OMX with a base value 1,000.00 on October 13, 2008 [or January 3, 2011]" precludes a possibility that the AlphaSector Indices were based on live trades, reasoning that an index could not have followed live trades before it was created. However, Defendants must read the statement in context. The footnote begins by stating that the "Index inception date is April 1, 2001." The portion of the footnote that Defendants claim provides clarification only indicates that the index was first calculated and disseminated by NASDAQ in October 2008. This is far from the cautionary statements found in In re ProShares stating that the table was "for illustration purposes only" or "not meant to suggest actual . . . fees or returns." In re ProShares, 728 F.3d at 105–06.

Defendants also argue that other portions of the registration statements made clear the funds were not created until well after 2008. For example, the disclosures for the Premium AlphaSector Fund present the "fund's performance from year to year over the life of the fund," including "since inception—7/1/2010." ECF No. 74 (Declaration of Daniel J. Stujenske), Ex. A (Jan. 25, 2013 Registration Statement) at 201.) However, these statements are focused on the AlphaSector funds, not the AlphaSector Indices. The Complaint alleges that the misstatements pertain to the AlphaSector Indices—an imaginary portfolio of securities representing that Index's trading strategy—not the AlphaSector funds, which actually managed assets.

Finally, although not binding on this Court, the SEC found that Virtus Advisers "included the misleading 'returns' of the back-tested AlphaSector index in appendices to certain Virtus AlphaSector Funds' prospectuses and marketing materials, including detailing the purported performance on a year-by-year basis." (In re Order Instituting Administrative and Cease-And-Desist Proceedings Pursuant To Sections 203(E) And 203(K) Of The Investment

<u>Advisers Act of 1940, and Sections 9(b) and 9(f) of the Investment Company Act of 1940,</u>

<u>Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order</u>, November

16, 2015, at 5.)

Thus, the Complaint adequately pleads that the information about the AlphaSector

Indices contained in the registration statements were misleading.

2.   Materiality

In order to determine whether a misleading statement is material, courts must

engage in a fact-specific inquiry.  <u>ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP</u>

<u>Morgan Chase Co.</u>, 553 F.3d 187, 197 (2d Cir. 2009).  "The test for whether a statement is

materially misleading . . . is whether the defendants' representations, taken together and in

context, would have misled a reasonable investor."  <u>Rombach</u>, 355 F.3d at 172 n.7 (citation

omitted).  With omissions, there must be "a <u>substantial</u> likelihood that the disclosure of the

[omitted material] would have been viewed by the <u>reasonable</u> investor as having <u>significantly</u>

altered the total mix of information [already] made available."  <u>In re ProShares</u>, 728 F.3d at 102

(quoting <u>TSC Indus., Inc. v. Northway, Inc.</u>, 426 U.S. 438, 449 (1976) (emphasis in original)).

"Because materiality is a mixed question of law and fact, in the context of a Fed. R. Civ. P.

12(b)(6) motion, 'a complaint may not properly be dismissed . . . on the ground that the alleged

misstatements or omissions are not material unless they are so obviously unimportant to a

reasonable investor that reasonable minds could not differ on the question of their importance.'"

<u>ECA, Local 134 IBEW</u>, 553 F.3d at 197 (quoting <u>Ganino v. Citizens Utilities Co.</u>, 228 F.3d 154,

162 (2d Cir. 2000)).

Defendants do not contest the materiality of the alleged misstatements with regard

to the Alpha Sector Rotation Fund and the Premium AlphaSector Fund, both of which track their

respective AlphaSector Index.  Instead, Defendants claim that the remaining three AlphaSector

14

Funds have no relation to the contested Indices and any statements pertaining to Indices, therefore, would not be material to the purchasers of the other three funds.  Notwithstanding those contentions, the Complaint sufficiently supports the materiality requirement.

A reasonable investor would be interested in the performance history of the investment strategy implemented by the funds in which he is investing.  Although only two funds specifically tracked the Indices, all of the funds are alleged to have "followed the AlphaSector strategy."  (Complaint ¶ 56.)  And the Complaint alleges that the AlphaSector track record was "the crucial selling point of the funds."  (Complaint ¶ 60.)  Moreover, as Plaintiffs point out, all of the funds are labeled "AlphaSector."  It is reasonable to believe that a typical investor might assume the AlphaSector Indices are relevant to all funds, or, at least, attribute brand success to other funds that do not specifically track the Indices.  Thus, whether the performance history was back tested is not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  ECA, Local 134 IBEW, 553 F.3d at 197.  Accordingly, the allegations in the Complaint are sufficient to survive a motion to dismiss.

C.  *Scienter*

Under Rule 9(b) and the PSLRA, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.  Dura, 544 U.S. at 345.  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Tellabs, 551 U.S. at 324.  To plead a "strong inference" of scienter, plaintiffs must allege "facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  ATSI, 493 F.3d at 99.  Where, as here, pleadings rely solely on the defendants'

alleged conscious misbehavior or recklessness, plaintiffs must show "conscious recklessness—
i.e., a state of mind approximating actual intent, and not merely a heightened form of
negligence." Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 106 (2d Cir. 2015) (citation
omitted).  And "[w]here the complaint alleges that defendants knew facts or had access to non-
public information contradicting their public statements, recklessness is adequately pled for
defendants who knew or should have known they were misrepresenting material facts with
respect to the corporate business." In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 76 (2d Cir.
2001).  "The allegations must show both '(1) specific contradictory information [that] was
available to the defendants (2) at the same time they made their misleading statements.'" Tyler
v. Liz Claiborne, Inc., 814 F. Supp. 2d 323, 336 (S.D.N.Y. 2011) (quoting In re PXRE Group,
Ltd., Sec. Litig., 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (emphasis in original)); see also
Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000) ("Where plaintiffs contend defendants had
access to contrary facts, they must specifically identify the reports or statements containing this
information.").

Plaintiffs plead several allegations relating to scienter, ranging from specific
events that evidence Defendants' scienter to specific facts Plaintiffs believe Defendants should
have known that would have alerted them to the misrepresentations.  Plaintiffs claim that
Aylward, Bradley, and the Independent Trustees' knowledge that the performance history of the
AlphaSector Indices was back tested can be inferred from: (1) statements made by a Virtus
product management executive at a wholesaler conference that the AlphaSector historical results
were back tested (Complaint ¶ 62), (2) statements made during a conference call to "destroy"
materials relating to AlphaSector's performance history (Complaint ¶ 64), (3) the removal of the
AlphaSector Indices from the registration statements after the SEC began an investigation of F-

Squared (e.g., Complaint ¶ 92), (4) warnings from FINRA relating to the performance history of the AlphaSector Indices (Complaint ¶ 58.a), (5) documents reviewed in connection with the approval of F-Squared as Virtus Trust's sub-advisor (e.g., ¶ 89), (6) certain "red flags," which ought to have alerted defendants to the falsity of the statements (e.g., Complaint ¶ 90), and (7) news articles from December 2013 referencing the SEC's investigation as to whether the AlphaSector Indices were back tested.[10]  The sum of the allegations raises a strong inference of scienter for Aylward, but fails with respect to Bradley and the Independent Trustees.

### 1.   The Boca Raton Conference

One of the strongest inferences of scienter stems from the Boca Raton conference in which a Virtus Partners executive told wholesalers "not to heed the portion of Present's remarks relating to F-Squared's allegedly 'live' track record.  F-Squared's incredible returns were . . . not based on actual client assets but on back testing of hypothetical assets."  (Complaint ¶ 62.)  The Complaint alleges that Aylward attended this conference by telephone but continued to sign registration statements that misleadingly suggested that the Indices were based on live trading since 2001.  (Complaint ¶ 63.)  See In re Philip Servs. Corp. Sec. Litig., 383 F. Supp. 2d 463, 472 (S.D.N.Y. 2004) (finding scienter adequately pled where defendants attended a board meeting at which participants discussed improperly recorded earnings, and those defendants later signed a registration statement that reported the false earnings).  But because the Complaint does

---

[10] Virtus Defendants argue that many of these statements are taken directly from the Complaint in In re Virtus Inv. Partners, Inc. Securities Litigation, Case No. 15-cv-1249 (WHP) and should therefore be discounted.  However, "[n]either Circuit precedent nor logic supports such an absolute rule."  In re Bear Stearns Mortgage Pass-Through Certificates Litig., 851 F. Supp. 2d 746, 768 (S.D.N.Y. 2012) ("It makes little sense to say that information . . . which [the complaint] could unquestionably rely on if it were mentioned in a news clipping . . . is immaterial simply because it is conveyed in an unadjudicated complaint.").  Accordingly, this Court will not discount such references.  See In re OSG Sec. Litig., 12 F. Supp. 3d 619, 621 (S.D.N.Y. 2014) ("Lipsky did not hold that a complaint may never reference allegations from a separate proceeding under any circumstances.").

not allege that Bradley or the Independent Trustees attended this conference or ever heard the announcement, this inference of scienter cannot be imputed to them.

### 2.   The Conference Call

A similar allegation relating solely to Aylward's scienter concerns a Virtus Partners management conference call.  After Present revealed that the SEC was investigating F-Squared regarding AlphaSector's performance history from 2001 to 2008, Virtus Partners management, including Aylward, organized a call in which Virtus Partners employees were told to destroy materials relating to AlphaSector's track record.  (Complaint ¶ 64.)  This allegation may create a strong inference of scienter as to Aylward, but, again, the Complaint fails to allege that Bradley or the Independent Trustees were involved with the conference call.  Accordingly, the conference call can only be used to support an inference of scienter for Aylward.

### 3.   Removal of the AlphaSector Indices

Plaintiffs claim that scienter can be inferred from Virtus Trust's decision to "remove all references to the pre-2008 historic results . . . without disclosing to investors that the results were back-tested."  (e.g., Complaint ¶ 100.)  However, excision of the pre-2008 results does not give rise to an inference Virtus Trust was aware that those results were back tested.  Indeed, Plaintiffs' companion allegation that Virtus Partners deleted the pre-2008 data from post-effective registration statements on the heels of Present's disclosure that "F-Squared was under investigation by the SEC" undercuts that inference.  (Complaint ¶ 92; see also Complaint ¶ 64.)  The more cogent and compelling inference to be drawn from these allegations is that the trustees removed references to the pre-2008 results out of an abundance of caution after learning of the pending SEC investigation of F-Squared.  And knowledge of the existence of an investigation is not sufficient to support an inference of scienter.  See Lipow v. Net1 UEPS Techs., Inc., 131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015) ("[G]overnment investigations cannot bolster allegations of

scienter that do not exist, and, as currently plead, the government investigations are just that, investigations."); In re Manulife Fin. Corp. Sec. Litig., 276 F.R.D. 87, 102 (S.D.N.Y. 2011) ("Securities regulators are obligated to examine the behavior of public corporations, and the fact that a regulator is fulfilling this role cannot be sufficient to allege scienter."); Patel v. L-3 Commc'ns Holdings Inc., 2016 WL 1629325, at *10 (S.D.N.Y. Apr. 21, 2016) ("[T]he alleged . . . Government investigations on their own do not create a strong inference of scienter.").

    4.  FINRA Warnings

Plaintiffs allege that warnings from FINRA in 2009 put Aylward, Bradley and the Independent Trustees on notice that the Indices contained back-tested information.  (Complaint ¶ 58.a.)  However, the Complaint alleges only that FINRA warned Virtus Partners of the back-tested nature of the AlphaSector Indices.  Nowhere does the Complaint explain how Bradley or the Independent Trustees—the CFO and trustees of Virtus Trust—learned of the warnings.  See In re Marsh & McLennan Cos., Inc. Sec. Litig., 501 F. Supp. 2d 452, 484 n.14 (S.D.N.Y. 2006) ("[T]he allegations of misconduct at . . . other subsidiaries do not establish the individual defendants' scienter . . . .").  And this Court cannot "rest on the assumption that . . . Defendants received information because of their corporate positions."  Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co., 724 F. Supp. 2d 447, 462 (S.D.N.Y. 2010).  Accordingly, these scienter allegations are also deficient as to Bradley and the Independent Trustees.

    5.  Virtus Trust's Approval of F-Squared

A plaintiff may allege scienter by pleading that defendants "failed to check information they had a duty to monitor."  Local No. 38, 724 F. Supp. 2d at 459.  Pursuant to Section 15 of the Investment Company Act, the trustees of Virtus Trust were required to annually approve the retention of any sub-advisor, including F-Squared.  In connection with this

obligation, the trustees requested and reviewed documentation directly from F-Squared (e.g.

Complaint ¶ 89) and considered "the historical investment returns of the Index as published by

[the] subadviser." (Complaint ¶ 86.c).  Plaintiffs argue that the trustees falsely claimed that they

reviewed documents relating to the historical performance of the Indices and that if the trustees

had properly conducted due diligence, they would have learned that the Indices contained back-

tested information.

   The Complaint belies Plaintiffs' argument.  First, the 2009 Certified Shareholder

Report, on which Plaintiffs rely, states that the trustees "did not identify any particular

information that was all-important or controlling, and each Trustee attributed different weights to

the various factors," including the same performance history contained in the registration

statements that Plaintiffs claim deceived so many.  (See Complaint ¶ 86.c).  But a reading of this

report does not support the inference Plaintiffs urge that the trustees approved F-Squared based

on documents that did not existent.  Second, no amount of effort on the part of the trustees to

review information from F-Squared would have revealed that the performance history was back

tested because Present and F-Squared were lying about the performance history of the Indices.

(Complaint ¶ 58.b.)  Finally, allegations relating to the due diligence that the trustees should have

conducted also miss the mark.  "[E]ven an egregious failure to gather information will not

establish . . . liability as long as the defendants did not deliberately shut their eyes to the facts."

Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce, 694

F. Supp. 2d 287, 298 (S.D.N.Y. 2010) (citation omitted).  In the end, the most plausible inference

to be drawn from the allegations relating to the Independent Trustees' approval of F-Squared is

that they too were deceived by F-Squared.  Tellabs, 551 U.S. at 310 ("A complaint will survive,

we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.").

6.  Red Flags

Plaintiffs argue that the existence of two "red flags" should have alerted Aylward, Bradley, and the Independent Trustees to the back-tested nature of the AlphaSector Indices: (1) "[n]either F-Squared nor Newfound Research existed until 2006 and 2008 respectively" and (2) the intern who developed AlphaSector "was 14 years old when the AlphaSector Index was supposedly developed in 2001."  (Complaint ¶ 90.)  Despite the rhetorical value of these "red flags," Plaintiffs fail to allege where or when Aylward, Bradley, or the Independent Trustees learned of them.  Saltz v. First Frontier, LP, 782 F. Supp. 2d 61, 71 (S.D.N.Y. 2010) (finding allegations about red flags insufficient to establish scienter where "Plaintiffs offer no evidence Defendants were aware of most red flags"); Plumbers, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) ("[A] complaint 'must specifically identify the reports or statements' that are contradictory to the statements made.") (quoting Novak, 216 F.3d at 309).  Indeed, Plaintiffs make much of the "red flag" relating to the intern's age and assert that when the trustees reviewed the "bios" of "key personnel," they should have discovered the intern's age.  But the intern was employed by Newfound Research, not F-Squared, and even though they entered into a subsequent partnership, that seems to be a rather slender reed on which to rest liability.

7.  News Reports

At oral argument, Plaintiffs' counsel suggested that news articles from December 2013—reporting that the SEC had commenced an investigation into F-Squared and whether the AlphaSector Indices contained back-tested performance history—presented Defendants with "knowledge of facts or access to information contradicting their public statements."  In re PXRE Grp., Ltd., Sec. Litig., 600 F. Supp. 2d 510, 535–36 (S.D.N.Y. 2009) (quoting Kasaks, 216 F.3d

at 308).   However, "[n]umerous courts have suggested or assumed that the contradictory

information must have been non-public in order to raise a strong inference of intent . . . .   That

the information was publicly available when the allegedly misleading statements were made

weakens any inference that defendants intended to defraud the market."   In re Pfizer, Inc. Sec.

Litig., 538 F. Supp. 2d 621, 637 (S.D.N.Y. 2008); see also In re GeoPharma, Inc. Sec. Litig., 399

F. Supp. 2d 432, 452 (S.D.N.Y. 2005).   Further, because the news articles reported on an

investigation into fraud, the news articles only provided Bradley and the Independent Trustees

with knowledge of accusations, not with facts contradictory to their statements.   And, in any

event, the news articles were not available to Bradley or the Independent Trustees "at the same

time they made their misleading statements," Tyler, 814 F. Supp. 2d at 336, because the Indices

had already been removed from the registration statements.

   III.   Sections 11 and 12(a)(2) of the Securities Act

         Sections 11 and 12(a)(2) of the Securities Act "impose liability on certain

participants in a registered securities offering when the registration statement or prospectus

contains material misstatements or omissions."   Panther Partners Inc. v. Ikanos Commc'ns, Inc.,

681 F.3d 114, 119 (2d Cir. 2012).   "Section 11 applies to registration statements, and section

12(a)(2) applies to prospectuses and oral communications."   In re Morgan Stanley Info. Fund

Sec. Litig., 592 F.3d 347, 358 (2d Cir. 2010).   "Claims under sections 11 and 12(a)(2) are . . .

Securities Act siblings with roughly parallel elements . . . ."   In re Morgan Stanley, 592 F.3d at

359.   Neither require a pleading of scienter, reliance or loss causation.   Panther Partners, 681

F.3d 120.   Where, as here, "the claims are premised on allegations of fraud," a plaintiff must

meet the "heightened pleading standard of Rule 9(b)."   Rombach, 355 F.3d at 171.

         To state a claim under Section 11, a plaintiff must allege that: "(1) [he] purchased

a registered security, either directly from the issuer or in the aftermarket following the offering;

(2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  In re Morgan Stanley, 592 F.3d at 358–59 (quoting 15 U.S.C. § 77k(a)).

To state a claim under Section 12(a)(2), the plaintiff must allege: "(1) the defendant is a 'statutory seller'; (2) the sale was effectuated 'by means of a prospectus or oral communication'; and (3) the prospectus or oral communication 'include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.'"  In re Morgan Stanley, 592 F.3d at 359 (quoting 15 U.S.C. § 77l(a)(2) (alterations in original)).

Defendants argue that the Section 11 claims are time-barred by the statute of limitations; that the Section 12(a)(2) claims are partially time-barred by the statute of repose; and that the Complaint fails to allege that the Section 12(a)(2) defendants were statutory sellers.[11]

A. *Statute of Limitations*

Claims under Section 11 must be "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."[12]  Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc., 721 F.3d 95, 107 (2d Cir. 2013).  Although the Second Circuit has not decided whether an "inquiry notice" or "discovery rule" applies, In re Magnum Hunter Res. Corp. Sec. Litig., 616 F.

---

[11] Defendants also argue that the Securities Act claims fail to plead a material misstatement or omission and are subject to the affirmative defense of negative causation.  But these arguments are meritless for the same reasons discussed above.

[12] "Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint."  Ellul v. Congregation of Christian Bros., 774 F.3d 791, 798 n.12 (2d Cir. 2014); see also NECA-IBEW Pension Trust Fund v. Lewis, 607 F. App'x 79, 81 (2d Cir. 2015), cert. denied, 136 S. Ct. 821 (2016) (dismissing claims on a motion to dismiss due to "the widespread press coverage that Countrywide received in national publications such as The New York Times and The Wall Street Journal in 2007 and 2008").

App'x 442, 447 (2d Cir. 2015), "[t]he majority of courts in this district" have maintained that inquiry notice applies to Section 11 claims.  Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp., 874 F. Supp. 2d 341, 364 (S.D.N.Y. 2012).  "In determining when a reasonable investor would have discovered the fraud, courts may take judicial notice of 'the fact that press coverage contained certain information, without regard to the truth of [its] contents.'"  Monroe Cty. Employees' Ret. Sys. v. YPF Sociedad Anonima, 15 F. Supp. 3d 336, 348 (S.D.N.Y. 2014) (quoting Rivas v. Fischer, 687 F.3d 514, 520 n.4 (2d Cir. 2012)).  Even under the less-onerous discovery rule, courts have acknowledged that "a reasonably diligent plaintiff would undertake an investigation based on . . . 'news articles and analyst's reports,' and 'prospectuses, quarterly reports, and other information related to their investments.'"  Gavin/Solmonese LLC v. D'Arnaud-Taylor, 68 F. Supp. 3d 530, 536 (S.D.N.Y. 2014), aff'd, 2016 WL 125434 (2d Cir. Jan. 12, 2016) (quoting Pension Trust Fund for Operating Engineers v. Mortgage Asset Securitization Transactions, Inc., 730 F.3d 263, 276–77 (3d Cir. 2013)).

   Here, Present asserts that the Section 11 claims are time-barred under either limitations standard because multiple news reports published in December 2013 detail the exact wrongs alleged in the Complaint and "would have led a reasonably diligent plaintiff to have discovered the facts underlying his claim."  In re Magnum Hunter, 616 F. App'x at 447.  The news reports triggering the statute of limitations were published in *The Wall Street Journal*, *Barron's*, and *The Financial Times*.  Those articles straightforwardly reported that the SEC was investigating the exact allegations contained in the Complaint.  For example, the December 11, 2013 *The Wall Street Journal* article titled, "SEC Probes F-Squared Over Performance Marketing, Scrutiny Concerns Whether Firm Properly Disclosed Historical Performance to Investors" states:

The Securities and Exchange Commission is probing one of the biggest players in the fast-growing field of exchange-traded fund managed portfolios, F-Squared Investments Inc., over whether it properly disclosed its historical performance to investors, the firm recently told clients.

Under scrutiny is whether F-Squared made clear in its marketing materials that returns <u>for a pair of indexes on which the firm bases client portfolios were for some years theoretical performance and didn't reflect actual investor returns</u>, according to people familiar with the matter. . . .

For example, a June 2011 investor presentation for F-Squared's AlphaSector Premium Index—the firm's current flagship strategy—depicted performance of the index back to April 2001.

This article clearly describes the allegedly misrepresented facts undergirding the Complaint: the AlphaSector Indices only reflected "theoretical performance and didn't reflect actual investor returns." Reading the article, an AlphaSector funds investor would have learned that the performance history may not have been based on "live" data. At a minimum, a reasonably diligent plaintiff would have investigated further, and uncovered the facts necessary to bring suit. Accordingly, the one year statute of limitations for any Section 11 claim was triggered in December 2013 and Plaintiffs' Section 11 claim is time-barred.[13]

### B. *The Statute of Repose*

Claims under Section 12(a)(2) are subject to an absolute statute of repose. Such claims must be brought within three years after the sale of the security. This action was not commenced until May 8, 2015. Accordingly, Plaintiffs are time-barred from pursuing Section 12(a)(2) claims for sales of fund shares made prior to May 8, 2012.

---

[13] "Because the Court's analysis of the argument made by [Present] on this issue applies equally to all defendants . . . the Court's finding on such issue will apply to all parties." <u>Doll v. Stars Holding Co.</u>, 2005 WL 2811767, at *1 (N.D. Cal. Oct. 27, 2005); <u>see also</u> <u>Walner v. Friedman</u>, 410 F. Supp. 29, 34 (S.D.N.Y. 1975) ("Although one defendant has not joined in the motions to dismiss, his position is indistinguishable from that of the other defendants, and the same relief will be granted as to him upon the Court's own motion.").

C. *Section 12(a)(2) Statutory Seller*

Section 12(a)(2) only imposes liability on certain "statutory sellers."  "An individual is a 'statutory seller' . . . if he: (1) 'passed title, or other interest in the security, to the buyer for value,' or (2) 'successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities['] owner.'"  In re Morgan Stanley, 592 F.3d at 359 (quoting Pinter v. Dahl, 486 U.S. 622, 642, 647 (1988)).  "Congress did not intend that the section impose liability on participants' collateral to the offer or sale" or even those whose conduct constituted "substantial participation in the sales transaction."  Pinter, 486 U.S. at 650–51.  A pleading must allege that a defendant did more than merely sign a registration statement or prospectus to allege liability under Section 12(a)(2).  See Citiline Holdings, Inc. v. iStar Fin. Inc., 701 F. Supp. 2d 506, 512 (S.D.N.Y. 2010) (noting that every Court of Appeals to consider the issue has concluded that "an individual's signing a registration statement does not itself suffice as solicitation under Section 12(a)(2)").  And "Section 12 liability cannot be imposed upon 'those who merely assist in another's solicitation efforts.'"  Shain v. Duff & Phelps Credit Rating Co., 915 F. Supp. 575, 581 (S.D.N.Y. 1996) (quoting Pinter, 486 U.S. at 651 n.27).

Here, the Complaint alleges that VP Distributors served as Virtus Trust's underwriter and "provided shares to investors."  (Complaint ¶ 187.)  The SEC filings relied on in the Complaint support this notion and explain that "[o]pen-end mutual fund shares are distributed by [VP Distributors]."  (Virtus Partners 2013 Form 10-K (filed Feb. 24, 2014) at 8.)  While Defendants claim that the registration statements imply that the funds sold the shares themselves and direct investors to send checks "payable to the fund," (January 25, 2013 Registration Statement, at 201), it is not clear who actually passed title of the shares.  For now, it is plausible that the shares were sold to investors by VP Distributors.

However, the Complaint fails to adequately plead allegations that Aylward or Virtus Partners were statutory sellers.  The Complaint alleges only that Virtus Partners' wholesalers "marketed the AlphaSector Funds <u>to brokers</u>,"—not investors—and made marketing materials available on "their website and other channels."  (SAC ¶ 187 (emphasis added); Complaint ¶ 51 ("F-Squared stated in marketing materials to wholesalers and brokers (who in turn recommended AlphaSector Funds to Class Members).").  The Complaint does not allege that Aylward or Virtus Partners actively or directly marketed the AlphaSector funds to investors. <u>Cf.</u> <u>In re Vivendi Universal, S.A.</u>, 381 F. Supp. 2d 158, 186 (S.D.N.Y. 2003) (finding adequate allegations that CEO was statutory seller where he "regularly appeared before investors and financial news agencies to tout the financial vitality of Vivendi and thereby encourage investors to purchase Vivendi's securities"); <u>In re WorldCom, Inc. Secs. Litig.</u>, 294 F. Supp. 2d 392, 423 (S.D.N.Y. 2003) (finding adequate allegations that underwriter was a statutory seller where underwriter "participat[ed] in 'road show' meetings").  At most, the Complaint alleges that Virtus Partners distributed the marketing materials "through their website and other channels." (Complaint ¶ 187.)  But such allegations are insufficient.  <u>See</u> <u>Shaw v. Digital Equip. Corp.</u>, 82 F.3d 1194, 1215 (1st Cir. 1996) ("[A] person's 'remote' involvement in a sales transaction or his mere 'participat[ion] in soliciting the purchase' does not subject him to Section 12 liability.") (quoting <u>Pinter</u>, 486 U.S. at 651 n. 27)); <u>Craftmatic Secs. Litig. v. Kraftsow</u>, 890 F.2d 628, 636 (3d Cir. 1989) (requiring "direct and active participation in the solicitation of the immediate sale to hold the issuer liable" under Section 12(a)(2)).)

While indirect solicitation can suffice to state a claim under Section 12(a)(2), <u>see</u> <u>Capri v. Murphy</u>, 856 F.2d 473, 478 (2d Cir. 1988), the allegations in the Complaint fall short. In <u>Capri</u>, the Second Circuit held that general partners in a mining venture were statutory sellers,

even though they did not directly communicate with the investors, because they had specifically directed the promotional efforts and hired sales agent to act on their behalf.  But that is not what is alleged here.  The Complaint alleges only that Aylward and Virtus Partners supervised the wholesalers marketing of the funds to the brokers, not that they controlled the brokers or that the brokers served as their agents.  The fact that Virtus Partners provided "financial incentives" (Complaint ¶ 187) does not change this analysis, as brokers are customarily provided a commission for their efforts.

IV.    Control Person Claims

Plaintiffs allege control person liability under Section 15 of the Securities Act and Section 20(a) of the Exchange Act as to virtually every named defendant: Virtus Partners, Virtus Advisers, Aylward, Bradley, the Independent Trustees, Angerthal, Waltman, Flynn, Euclid, Robinson, F-Squared, and Present.  To establish liability under Section 15, a plaintiff must show a primary violation of the Securities Act by the controlled person and control of the primary violator.  Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc., 104 F. Supp. 3d 441, 573 (S.D.N.Y. 2015).  To establish liability under Section 20, the plaintiff must show a primary violation of the Exchange Act, control of the primary violator, and that "the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  ATSI, 493 F.3d at 108.  "Because fraud is not an essential element of a § 20(a) claim, Plaintiffs need not plead control in accordance with the particularity required under Rule 9(b)" and the control analysis is the same for Section 15 as it is for Section 20.  McIntire v. China MediaExpress Holdings, Inc., 927 F. Supp. 2d 105, 122 (S.D.N.Y. 2013).  "However, the heightened pleading standards of the PSLRA apply with respect to the third-prong of a § 20(a) claim, which requires plaintiffs to allege facts demonstrating that the defendant was a culpable participant."  McIntire, 927 F. Supp. 2d at 122.

A.  *Primary Violation*

Plaintiffs' Section 15 claims fail because they are unable to establish a primary

violation of the Securities Act.  As discussed above, Plaintiffs' Section 11 claims are barred by

the statute of limitations.  See Teva Pharms. Indus. Ltd. v. Deutsche Bank Sec. Inc., 2010 WL

6864006, at *1 (S.D.N.Y. Dec. 14, 2010) (dismissing Section 15 claims where primary claims

under Securities Act were barred by statute of limitations).  And Plaintiffs' Section 15 claims do

not allege the Section 12(a)(2) claims as a primary violation.  (See Complaint ¶¶ 193–200.)

However, Plaintiffs adequately plead a primary violation for their Section 20

control person claims.  Plaintiffs' claims are premised on Virtus Trust's primary violation.

Although Virtus Trust is a not a party to this litigation, such a pleading is sufficient if Plaintiffs

adequately allege the elements of a Section 10(b) claim against Virtus Trust.  See In re MRU

Holdings Sec. Litig., 769 F. Supp. 2d 500, 508 (S.D.N.Y. 2011) ("[I]ndividual defendants may

be found liable under Section 20(a) as control persons even where the (bankrupt) corporation is

not a party, '[s]o long as the Complaint adequately alleges the elements of a Rule 10b-5 claim.'")

(quoting Sgalambo v. McKenzie, 739 F. Supp. 2d 453, 486 (S.D.N.Y. 2010)).

B.  *Culpable Participation*

"To adequately plead culpable participation, 'Plaintiffs must plead at a minimum

particularized facts establishing a controlling person's conscious misbehavior or recklessness in

the sense required by Section 10(b).'"  Floyd v. Liechtung, 2013 WL 1195114, at *6 (S.D.N.Y.

Mar. 25, 2013); see also In re ShengdaTech, Inc. Sec. Litig., 2014 WL 3928606, at *10

(S.D.N.Y. Aug. 12, 2014) (citations omitted) (collecting cases).  Under the PSLRA, "a plaintiff

must allege 'culpable participation' and plead that element with particularity."  In re NQ Mobile,

Inc. Sec. Litig., 2015 WL 1501461, at *4 (S.D.N.Y. Mar. 27, 2015).  As explained above, the

Complaint fails to allege with particularity that Bradley or any of the Independent Trustees acted

with a culpable state of mind.  Accordingly, the Section 20(a) claims are dismissed with regard

to those defendants.  See In re Livent, Inc. Sec. Litig., 78 F. Supp. 2d 194, 222 (S.D.N.Y. 1999)

("Plaintiffs do not satisfy the third requirement to allege a 20(a) claim for the Outside

Directors.").

   *C.  Actual Control*

   To plead a control person violation, a plaintiff must allege that the defendant had

"[a]ctual control over the wrongdoer and the transaction in question."  In re Alstom SA, 406 F.

Supp. 2d 433, 487 (S.D.N.Y. 2005); see also In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611,

663 (S.D.N.Y. 2007) ("[A] claim under § 20(a) requires . . . actual involvement in the making of

the fraudulent statements by the putatively controlled entity.").  The mere "exercise of influence

. . . is not sufficient to establish control."  H & H Acquisition Corp. v. Fin. Intranet Holdings,

669 F. Supp. 2d 351, 361 (S.D.N.Y. 2009) (quoting In re Alstom SA, 406 F. Supp. 2d at 487).

Rather, "[c]ontrol over a primary violator may be established by showing that the defendant

possessed the power to direct or cause the direction of the management and policies of a person,

whether through the ownership of voting securities, by contract, or otherwise."  S.E.C. v. First

Jersey Sec., Inc., 101 F.3d 1450, 1472–73 (2d Cir. 1996) (citations omitted).  Moreover,

boilerplate allegations that a party controlled another based on officer or director status are

insufficient.  In re Alstom SA, 406 F. Supp. 2d at 495, 488 n.51.  Nevertheless, "if that same

officer or director has signed financial statements containing materially false or misleading

statements, courts have held that control as to the financial statements is sufficiently pled."  In re

Alstom SA, 406 F. Supp. 2d at 487.

   1.   Adviser and Sub-Adviser Control

   The Complaint fails to allege that Virtus Advisers, Euclid, Robinson, F-Squared,

or Present had control over the statements made in Virtus Trust's registration statements.  Virtus

Advisers is a wholly owned subsidiary of Virtus Partners.  (Complaint ¶ 25.)  Euclid and F-Squared served as sub-advisers to the funds.  (Complaint ¶¶ 27, 43.)  Robinson, a director of Euclid, served as a portfolio manager of the AlphaSector Funds.  (Complaint ¶ 41.)  And Present, CEO of F-Squared, also served as a portfolio manager of the AlphaSector Funds.  (Complaint ¶ 40.)

 The Complaint alleges that, "by virtue of their status" and "by causing Virtus Trust to adopt the AlphaSector strategy for the AlphaSector Funds," Virtus Advisers, Euclid, Robinson, Present, and F-Squared are control persons.  (Complaint ¶ 167.)  However, status alone is not sufficient to establish control person liability.  See In re Satyam Computer Servs. Ltd. Sec. Litig., 915 F. Supp. 2d 450, 482 (S.D.N.Y. 2013) ("To plead control adequately, a plaintiff must plead "actual control, not merely control person status.") (citation omitted).  And Plaintiffs' allegation that Virtus Advisers, Euclid, Robinson, Present, or F-Squared caused Virtus Trust to adopt the AlphaSector strategy adds nothing because the "matter[] at issue" is the misstatements contained in the registration statement and marketing documents, not the adoption of the AlphaSector strategy.  In re Smith Barney Transfer Agent Litig., 884 F. Supp. 2d 152, 167 (S.D.N.Y. 2012) (finding "allegations . . . unavailing because they focus exclusively on [defendant's] 'control person status' rather than [defendant's] exercise of 'actual control over the matters at issue,'" and "do not allege that [defendant] signed, drafted, approved, . . . confirmed . . . [or] ordered or encouraged [officers or directors] to sign a misleading statement").

 At most, the allegations in the Complaint allow the Court to draw an inference that Virtus Advisers, Euclid, Robinson, F-Squared, or Present provided advice to Virtus Trust.  But this too is insufficient.  See In re Lehman Bros. Mortgage-Backed Sec. Litig., 650 F.3d 167, 187 (2d Cir. 2011) ("[A]llegations of advice, feedback, and guidance fail to raise a reasonable

inference that [defendants'] had the power to <u>direct</u>, rather than merely inform, the [primary violator's] ultimate structuring decisions. Put another way, providing advice that the banks chose to follow does not suggest control."). The allegations are also insufficient as to F-Squared, a "limited services subadviser[]," which lacked authority to "manage[] the investments" of [each] fund." (<u>E.g.</u>, Jan. 25, 2013 Registration Statement, at 170.)

### 2.   Angerthal, Flynn, and Waltman's Control

The Complaint fails to allege that Angerthal, Flynn, or Waltman had control over the statements made in Virtus Trust's registration statements. Angerthal is Executive Vice President, Chief Financial Officer, and Treasurer of Virtus Partners. (Complaint ¶ 30.) Flynn is Executive Vice President and General Counsel of Virtus Partners and Virtus Advisers. (Complaint ¶ 39.) And Waltman served as Senior Vice President for Product Development at Virtus Trust from 2003 to 2013 and currently serves as Executive Vice President of product development at Virtus Partners and Virtus Trust and Executive Vice President and Director of Virtus Advisers. (Complaint ¶ 38.)

Other than references to their job titles, the only allegation of control pertaining to Angerthal, Flynn, or Waltman is part of a single paragraph aggregating every individual defendant. That allegation asserts control "by virtue of their status as officers and directors of [Virtus Trust], and because they caused [Virtus Trust] to file the registration statements." (Complaint ¶ 167.) As explained, such allegations of "control person status" are insufficient. <u>See</u> <u>In re Satyam</u>, 915 F. Supp. 2d at 482.

In any event, the positions Angerthal, Flynn, and Waltman held do not support allegations of control over Virtus Trust. <u>See</u> <u>In re Smith Barney</u>, 884 F. Supp. 2d at 167 (["Defendant's] position at entities other than the [primary violator] does not demonstrate his control over the misleading statements in the [primary violator's] SEC filings."). Neither

Angerthal nor Flynn were employed by Virtus Trust, the maker of the statements.  (See

Complaint ¶¶ 30, 39.)  And while Waltman was employed by Virtus Trust for a time, his position

was in Product Development, not a position of "control" over the company's public statements.

(Complaint ¶ 38.)  The remaining "sparse facts regarding Defendants' control" of Virtus Trust

are insufficient to allege control.  Fezzani v. Bear, Stearns & Co., 384 F. Supp. 2d 618, 646

(S.D.N.Y. 2004).  Such formulaic boilerplate is insufficient to support a reasonable inference that

Angerthal, Flynn, or Waltman controlled Virtus Trust.  See In re Glob. Crossing, Ltd. Sec. Litig.,

2005 WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005) ("Conclusory allegations of control are

insufficient as a matter of law.").

### 3.    Virtus Partners and Aylward's Control

Notwithstanding pleading deficiencies for other defendants, the Complaint

adequately pleads that Virtus Partners and Aylward exercised control over the statements in

Virtus Trust's registration statements.  First, the Complaint alleges that Aylward, Virtus

Partners's CEO, "signed Virtus Trust's registration statements throughout the class period."

(Complaint ¶ 29.)  This alone is sufficient to allege control person status for Aylward.  See City

of Westland Police & Fire Ret. Sys. v. MetLife, Inc., 928 F. Supp. 2d 705, 721 (S.D.N.Y. 2013)

("Directors and officers who sign registration statements or other SEC filings are presumed to

control those who draft those documents.").  Moreover, the Complaint alleges that Virtus Trust

operates from the same office as Virtus Partners (Complaint ¶ 65), Virtus Trust's officers are

employed by Virtus Partners (Complaint ¶ 65), Virtus Partners's officers approved and signed

the registration statements (Complaint ¶ 156), and that Virtus Partners' management was

responsible for eliminating the references to AlphaSector's track record from the filings in

October 2013 after learning that the SEC was investigating F-Squared (Complaint ¶ 5).

33

Furthermore, "Virtus Investment Partners" is printed in bold on the front page of the registration statements.  (E.g., Jan. 25, 2013 Registration Statement.)

V.      State Law Derivative Claims

Under Delaware law, a "[share]holder may not pursue a derivative suit to assert a claim of the [trust] unless the [share]holder: (a) has first demanded that the [trustees] pursue the [trust's] claim and the [trustees] have wrongfully refused to do so; or (b) establishes that pre-suit demand is excused because the [trustees] are deemed incapable of making an impartial decision regarding the pursuit of the litigation."  Wood v. Baum, 953 A.2d 136, 140 (Del. 2008).[14]  "Rule 23.1 provides that a complaint in a derivative action must "state with particularity . . . any effort by the plaintiff to obtain the desired action from the [trustees] . . . ; and . . . the reasons for not obtaining the action or not making the effort."  Cent. Laborers' Pension Fund & Steamfitters Local 449 Pension Fund v. Dimon, 2016 WL 66501, --- F. App'x ----, at *2 (2d Cir. Jan. 6, 2016).  "Where a plaintiff bases its complaint on board action, demand is excused if 'under the particularized facts alleged, a reasonable doubt is created that: (1) the [trustees] are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.'"  In re Goldman Sachs Mortgage Servicing S'holder Derivative Litig., 42 F. Supp. 3d 473, 480 (S.D.N.Y. 2012) (quoting Aronson v. Lewis, 473 A.2d 805, 814 (Del. 1984) (emphasis in original)).  But "[w]here a plaintiff bases its complaint on board inaction, the analysis focuses on the first prong of Aronson."  In re Goldman Sachs, 42 F. Supp. 3d at 480 (emphasis in original).  Under either theory, the Complaint fails to allege demand futility.

---

[14] Virtus Trust is a statutory trust created under and governed by Delaware law, which applies an identical analysis for corporations as trusts when determining demand futility.  See Debussy LLC v. Deutsche Bank AG, 242 F. App'x 735, 736 (2d Cir. 2007).

First, there are no allegations that the directors were "interested."  A trustee is considered "interested" when a trustee "derives any personal financial benefit that does not accrue to the [trust] or [share]holders generally, or when a corporate decision will have a materially detrimental impact on a [trustee], but not on the [trust] and the [share]holders." Rahbari v. Oros, 732 F. Supp. 2d 367, 378 (S.D.N.Y. 2010).  Reasonable doubt as to a trustees' disinterestedness "can be established by alleging that the members of the board faced a substantial risk of personal liability as a result of the suit."  In re Goldman Sachs, 42 F. Supp. 3d at 481.  However, the "'mere threat of liability' is insufficient."  In re Goldman Sachs, 42 F. Supp. 3d at 481 (quoting Rales v. Blasband, 634 A.2d 927, 936 (Del. 1993).  Rather, the Complaint must allege that "defendants' actions were so egregious that a substantial likelihood of [trustee] liability exists."  Rahbari, 732 F. Supp. 2d at 377.

Here, the Independent Trustees' decisions to approve F-Squared as a sub-adviser, include the AlphaSector Indices' back-tested results in the registration statement, and utilize the AlphaSector strategy (Complaint ¶133), "is not [the] rare case" that "[rises] to such an egregious level" to establish a substantial likelihood of trustee liability.  Brautigam v. Rubin, 618 F. App'x 723, 725 (2d Cir. 2015).  As explained above, the allegations stemming from the "red flags," purported lack of due diligence, the Independent Trustees' corporate positions, and the eventual removal of the Indices from the registration statements, fail to support an inference that the Independent Trustees knew about the back-tested nature of the performance history.  Brautigam, 618 F. App'x at 725 ("[N]one of the 'red flags' alleged by [plaintiff] support an inference that the Board was aware of any wrongful conduct.").  Indeed, the Complaint alleges that the Independent Trustees were misled by F-Squared as much as anyone else.  (Complaint ¶ 58.b ("F-Squared and Present lied to Virtus Advisers about the history and performance of AlphaSector. .

35

. .").  Moreover, "[t]he allegation that independent directors signed misleading SEC filings . . . adds little to the demand futility analysis."  Morrone ex rel. Arotech Corp. v. Erlich, 2011 WL 1322085, at *7 (E.D.N.Y. Mar. 31, 2011).

In addition, the Complaint fails to allege facts to "overcome the powerful presumptions of the business judgment rule."  In re Goldman Sachs, 42 F. Supp. 3d at 486.  To raise a reasonable doubt as to whether a trustee action was the product of a valid exercise of business judgment, "plaintiffs must plead particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision."  In re J.P. Morgan Chase & Co. S'holder Litig., 906 A.2d 808, 824 (Del. Ch. 2005), aff'd, 906 A.2d 766 (Del. 2006).  However, as discussed, the Complaint does not allege that the Independent Trustees were aware that the Indices contained back-tested information.  Consequently, the Complaint does not support the inference that the Independent Trustees breached their fiduciary duties or acted in bad faith.  Moreover, Plaintiffs do not allege that the Independent Trustees failed to inform themselves adequately when making decisions.  As noted above, F-Squared and Present misrepresented material facts in response to Virtus Advisers' request for information.  (See Complaint ¶¶ 58.b, 84–87 ("Virtus used an array of methods to conduct due diligence . . . the Board of Virtus would re-review data relied on by F-Squared to determine that their conclusions based on those data were sound.").)

Because the Complaint does not allege sufficient facts to establish that demand was excused, the derivative claims are dismissed in their entirety.[15]

---

[15] Because this Court finds demand was not excused, it need not address the remaining arguments with regard to the derivative claims.

<u>CONCLUSION</u>

For the foregoing reasons, the Virtus Defendants, Independent Trustees, Present, and F-Squared's motions to dismiss are granted in part and denied in part.  The Section 10(b) claims are dismissed as to W. Patrick Bradley and the Independent Trustees.  The Section 20(a) claims are dismissed as to Euclid Advisers, LLC, Amy Robinson, Michael A. Angerthal, W. Patrick Bradley, Francis G. Waltman, Mark S. Flynn, the Independent Trustees, Howard Present, and the F-Squared defendants.  The Section 12(a)(2) claims are dismissed with regard to Virtus Partners and George R. Aylward.  Plaintiffs' Section 11, Section 15 and derivative claims are dismissed in their entirety.

The Clerk of Court is directed to terminate the motions pending at ECF Nos. 69, 72, 75 and 102.

Dated: July 1, 2016
        New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

37