UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
:
MARK YOUNGERS, *individually and on behalf* :
*of all others similarly situated*, :
:
                               Plaintiffs, :      15cv8262
:
   -against- :
:      <u>OPINION & ORDER</u>
:
VIRTUS INVESTMENT PARTNERS INC., *et al*. :
:
                               Defendants. :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, United States District Judge:

        Lead Plaintiff Mark Youngers, <u>et al.</u> ("Plaintiffs"), move to amend their complaint for a fourth time based on the purported discovery of new facts. Plaintiffs' motion came at an advanced stage of litigation—following the completion of fact discovery, in the midst of expert discovery, and shortly after this Court's decision to deny class certification.

        The motion to amend principally aims to cure the deficiencies that hobbled Plaintiffs' previous attempt to certify the class—namely, that new information obtained in discovery supports an omissions-based claim entitling Plaintiffs to a presumption of reliance for class certification. For the reasons that follow, the motion to amend is denied.

BACKGROUND

        After litigating this putative securities fraud class action for nearly two and a half years, Plaintiffs now seek to file a fourth iteration of their complaint styled as the Third Amended Complaint. Although their request comes on the heels of this Court's decision denying class certification, Plaintiffs contend that new facts obtained during discovery warrant

amendment. To place the motion in context, a recitation of the relevant procedural history is necessary.

I. Second Amended Complaint and Motion to Dismiss

On January 4, 2016, Plaintiffs filed a Second Amended Complaint.[1] (ECF No. 63.) In July 2016, this Court granted in part and denied in part the Defendants' motion to dismiss the Second Amended Complaint. In sustaining the Section 10(b) claim against Virtus Investment Partners ("VIP") and VIP's Chief Executive Officer and President, George Aylward, this Court reasoned that the complaint "rest[ed] on a single misstatement"—a misrepresentation that Virtus's AlphaSector Indices had an index inception date of April 1, 2001 when, in reality, the indices' track records were back-tested for the period between the inception date and October 2008. Youngers v. Virtus Inv. Partners Inc., 195 F. Supp. 3d 499, 514 (S.D.N.Y. 2016).

II. Discovery

Discovery commenced in August 2016. In a Scheduling Order jointly proposed by the parties and entered by this Court, the Defendants agreed to disclose "substantially all documents previously produced in government investigations concerning Virtus's AlphaSector funds by September 12, 2016." (ECF No. 122, ¶ 6.) According to Defendants, they provided Plaintiffs with over 3.2 million pages of documents previously produced to the SEC. (Def. Opposition to Motion to Amend ("Opp."), ECF No. 175, at 7–8.)

Separately, in December 2016, Newfound Research—the entity with which the Defendants sought to replace F-Squared as sub-advisor to the AlphaSector Funds—made a

---

[1] A scheduling order directing Plaintiffs to file the Second Amended Complaint by January 4, 2016 was entered on November 24, 2015. (ECF No. 61.) This is the last scheduling order expressly referencing a deadline for amended pleadings.

2

document production of its own to Plaintiffs. That production included SEC deposition transcripts of Corey Hoffstein, the college intern who devised the AlphaSector trading algorithm, and Tom Rosedale, the CEO of Newfound Research.

On January 6, 2017—while discovery was underway in this action—the Lead Plaintiff in In re Virtus Investment Partners, Inc. Securities Litigation ("In re Virtus"), No. 15cv1249, requested and received from Defendants additional SEC deposition transcripts, including those of Aylward and Francis Waltman, Virtus's Head of Product Management. Although the Youngers Plaintiffs apparently did not request those deposition transcripts, Defendants voluntarily shared them. It is in these deposition transcripts where Plaintiffs claim they unearthed a new fact on which they now seek to amend their complaint—namely, that as of July 2013, Aylward and Waltman became aware of, or knew, that the AlphaSector indices contained a calculation error giving rise to a duty to correct previously issued statements.

In March 2017, Defendants made another document production containing a communication dated October 2013 where F-Squared's counsel notified Virtus of the SEC's investigation into F-Squared concerning the use of an inaccurate AlphaSector indices track record. The communication further reflects that F-Squared would remove such information from its marketing materials. (Def. Memo. of Law in Support of Motion to Amend ("Mot."), ECF No. 169, at 3.) Plaintiffs contend that F-Squared's communication coincided with Virtus's publication of a new prospectus which also removed that track record—a fact that further supports their contention that Aylward and VIP knew, if not as early as July 2013, then at the latest October 2013, that the AlphaSector indices track record was inaccurate. (Mot. at 3.)

The parties completed fact discovery in June 2017. In sum, over 25 fact

3

depositions were conducted and more than 4 million pages were produced by Defendants. (Opp. at 8.) And in August 2017, shortly after this motion was filed, the parties completed expert discovery.

III. Class Certification

On November 7, 2016, concurrent with discovery, Plaintiffs moved for class certification. On January 16, 2017—shortly after Plaintiffs received the critical SEC deposition transcripts in question—Defendants filed their opposition to class certification. On February 17, 2017, Plaintiffs replied. At the beginning of March 2017, this Court heard oral argument on the class certification motion.

In May 2017, this Court denied Plaintiffs' motion for class certification largely on the basis that Plaintiffs failed to satisfy Rule 23's predominance requirement. Because the Second Amended Complaint was "primarily built around misrepresentations, [and] omissions, if any[,] [only] serve[d] to exacerbate and bolster [those] misrepresentation claims," this Court held that Plaintiffs were not entitled to a presumption of reliance under Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972). Youngers v. Virtus Inv. Partners Inc., 2017 WL 2062986, at *3 (S.D.N.Y. May 15, 2017). With the predominance inquiry turning on the element of reliance in this case, this Court found that proof of individualized reliance on Defendants' alleged misstatements would overwhelm any common issues, thus rendering Plaintiffs' claims unsuitable for resolution on a classwide basis. Youngers, 2017 WL 2062986, at *2–3.

IV. Motion to Amend

On June 12, 2017—just a few weeks after this Court denied class certification—Plaintiffs filed a pre-motion conference letter seeking leave to amend their complaint. (ECF No.

4

150.) In their letter application, Plaintiffs asserted that new facts unearthed in discovery, would "advance several causes of action that . . . [would] cure deficiencies identified" by this Court's decisions regarding the Defendants' motion to dismiss and Plaintiffs' motion for class certification. (ECF No. 150 at 1.) Notwithstanding its initial misgivings about permitting amendment at this juncture in the litigation, this Court fixed a briefing schedule. On September 7, 2017, the parties appeared for oral argument.

## DISCUSSION

I. Rule 16—Good Cause

Normally, a motion to amend is evaluated under Rule 15 of the Federal Rules of Civil Procedure, which provides that amendment "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). However, once a scheduling order has been entered in an action, Rule 16(b) governs a motion to amend. Parker v. Columbia Pictures Indus., 204 F.3d 326, 339 (2d Cir. 2000).

Under Rule 16(b), a scheduling order "shall not be modified except upon a showing of good cause . . . ." Good cause exists when a party can demonstrate that the scheduling deadline—here, the date by which the Second Amended Complaint should have been filed[2]—could not be met despite the moving party's diligence. Grochowski v. Phoenix Constr.,

---

[2] Plaintiffs claim that because "no deadline was set in the scheduling order for amendment, leave to amend is not governed by the good cause standard." (Mot. at 18.) There were a number of scheduling orders entered in this action. Most relevant, for purposes of assessing the amended pleadings deadline, is the Scheduling Order dated November 24, 2015 (ECF No. 61), which directed Plaintiffs to file their amended complaint by January 4, 2016. And while the latest scheduling order dated August 17, 2016 (ECF No. 122) does not reference a deadline for amended pleadings, there is good reason for that. By that juncture, this Court had resolved Defendants' motion to dismiss, directed the commencement of discovery on Plaintiffs' surviving claims, and fixed a date for a class certification motion. Simply put, neither the parties nor this Court had any reason to anticipate yet another amended pleading. Nor was this Court required to fix another deadline for amendment to the pleadings. See Levy v. Young Adult Inst., Inc., 2016 WL 3637109, at *4 (S.D.N.Y. June 29, 2016) ("[T]he Court has not revised the deadline for

5

318 F.3d 80, 86 (2d Cir. 2003). In other words, the "good cause standard [of Rule 16] is not satisfied when the proposed amendment rests on information that the party knew or should have known, in advance of the deadline." Lamothe v. Town of Oyster Bay, 2011 WL 4974804, at *6 (E.D.N.Y. Oct. 19, 2011). The "primary consideration" under the good cause analysis is "whether the moving party can demonstrate diligence." Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 244 (2d Cir. 2007).

        Plaintiffs cite to two categories of evidence that they lacked at the time the Second Amended Complaint was filed: (1) Aylward and Waltman's SEC deposition testimony; and (2) a copy of an October 2013 communication from F-Squared notifying Defendants that it was under investigation by the SEC. According to Plaintiffs, these documents contain new facts that significantly alter their theory of liability. Both the SEC deposition transcripts and F-Squared's October 2013 communication reveal that VIP and Aylward learned—as early as July 2013 and at the latest October 2013—that previously filed track records of the AlphaSector Indices contained a calculation error, rendering the track record false during the entire period they were published. Plaintiffs claim that once VIP and Aylward learned of these calculation errors, they had a duty to correct the inaccurate track records.

        Defendants assert that the facts and theory on which Plaintiffs seek to amend their complaint were incorporated into the Second Amended Complaint. Additionally, Defendants argue that the factual support for a "duty to correct" claim could have been gleaned from other publicly available documents that Plaintiffs relied on extensively in drafting the Second

---

amending the pleadings or given the parties any reason to believe that it has changed. The Court is not obliged to specify in every order extending deadlines which deadlines have not been extended.").

Amended Complaint.  Indeed, the complaint in In re Virtus, the SEC Consent Orders against F-Squared and Virtus Investment Advisors, and the Second Amended Complaint generally set forth allegations regarding a calculation error in the AlphaSector Indices.  (See Declaration of Shannon K. McGovern in Opposition to Motion to Amend ("McGovern Decl."), ECF No. 176, Ex. D ("In re Virtus Complaint"), ¶ 154 ("[T]he index track record had been removed because it was now known to be materially false . . . [Defendants] were personally aware, that . . . the backtested hypothetical results were inaccurate and grossly inflated."); Ex. E (SEC Consent Order against Virtus Investment Advisors), ¶ 21 ("[P]rincipals for the firm that provided F-Squared with the signals for AlphaSector . . . informed Virtus that they believed the AlphaSector index's track record may have been miscalculated."); Second Amended Complaint ("SAC"), ECF No. 63, ¶ 54 ("Defendants also concealed the fact that the back-test was performed incorrectly and contained a performance error, leading to grossly inflated results.").)

    The key question here then is whether, at the time of the Second Amended Complaint, Plaintiffs had the information to assert a duty to correct claim against the Defendants they now target in their proposed amendment.  Put another way, good cause to amend would not exist if the Plaintiffs possessed information of a similar nature found in the SEC deposition transcripts or F-Squared's October 2013 communication yet failed to assert a duty to correct claim against Aylward and VIP in their Second Amended Complaint.

    As a preliminary matter, that facts on which the Plaintiffs seek to amend their complaint were discovered in SEC deposition transcripts—documents so fundamentally and obviously germane to both the subject matter and claims in this securities fraud action—begs the question as to why Plaintiffs never requested these transcripts.  While Plaintiffs claim that these

7

documents "were not included in Defendants' initial production of documents that Defendants were ordered to produce by September 12, 2016" pursuant to the August 2016 Scheduling Order (Mot. at 2), the particular paragraph in question simply directs the Defendants to "produce substantially all documents previously produced in government investigations." (ECF No. 122, ¶ 6.) It encompasses documents produced to the SEC, but does not so clearly extend to documents generated in connection with SEC proceedings.

Moreover, in December 2016—nearly four months after discovery began—Newfound Research produced SEC deposition transcripts of Corey Hoffstein and Tom Rosedale. (McGovern Decl. ¶ 7.) Receiving some SEC deposition transcripts raises the question why Plaintiffs did not request all relevant SEC deposition transcripts of the key players in this action. Indeed, while the In re Virtus plaintiffs sought transcripts of SEC interviews and depositions (McGovern Decl. ¶ 4), it appears the Youngers Plaintiffs here were simply beneficiaries of that request as Defendants voluntarily produced a raft of transcripts in January 2017 to both groups of plaintiffs. In this context, it appears that Plaintiffs could have been more diligent about what they sought in discovery, especially where civil fraud actions such as this one offer the opportunity to piggyback on the investigation of a government regulator.

Nevertheless, though the Plaintiffs could have acted sooner to obtain these critical documents, they could not have done so prior to either the January 4, 2016 deadline set forth in the November 2015 Scheduling Order or at any period referenced in the August 2016 Scheduling Order. While it is true that the Second Amended Complaint alleges the back-tested results of the AlphaSector indices were miscalculated, there is no specific indication that either Aylward or VIP discovered those errors as early as July 2013. The Second Amended Complaint alleges, in

8

relevant part, that the "Defendants [ ] concealed the fact that the back-test was performed incorrectly and contained a performance error, leading to grossly inflated results," and that Virtus Opportunities Trust, the issuer of the misstated registration statements, "did not retract or correct [the] prior misrepresentations" based on the calculation errors.  (SAC ¶¶ 54, 78; see also SAC ¶ 208.)  But all of these allegations pertain to the Defendants generally and make no distinction as to who knew, or should have known, about these calculation errors.  Nor do the allegations provide an indication as to when any individual Defendant learned about the miscalculated track records.  Those distinctions are critical, particularly with regard to scienter, in view of the heightened pleading standards against which a Section 10(b) claim is assessed.  In re Centerline Holding Co. Sec. Litig., 380 F. Appx. 91, 93 (2d Cir. 2010) ("[W]here liability is premised upon alleged material omissions, if the complaint does not present facts indicating a clear duty to disclose—such as that arising from the need to correct or update prior statements—plaintiff's scienter allegations do not provide strong evidence of conscious misbehavior or recklessness.") (citing Kalnit v. Eichler, 264 F.3d 131, 144 (2d Cir. 2001)).  Had Plaintiffs asserted their proposed claims against Aylward and VIP based on the allegations in the Second Amended Complaint, Defendants likely would have exploited this pleading deficiency in their motion to dismiss.

Moreover, none of the operative documents that Plaintiffs reviewed in drafting their Second Amended Complaint contain any information from which a Section 10(b) duty to correct claim against VIP or Aylward could plausibly have been asserted.  To start, the SEC Consent Orders from December 2014 and November 2015 are directed against F-Squared and Virtus Investment Advisors, respectively.  While those orders allege that AlphaSector indices'

9

track record was miscalculated, they do not specify whether anyone at VIP or Aylward learned this information. Further, the December 2014 Consent Order makes no reference to any of the Virtus entities or officers. And the November 2015 Consent Order does not relate to VIP beyond acknowledging that it is the parent company of Virtus Investment Advisors.

Other publicly filed documents in separate actions—namely, the In re Virtus complaint and the complaint against F-Squared founder, Howard Present—offer very little from which the Plaintiffs could have, in good faith, asserted a duty to correct claim against Aylward and VIP. First, the complaint against Present, like the SEC's Consent Order against F-Squared, makes virtually no reference to Virtus. Second, while the In re Virtus complaint alleges that in May 2013 a Newfound Research employee ran a backtest where "in just a few days of work [he] discovered the calculation error that had substantially inflated AlphaSector's purported pre-September 2008 track record" (In re Virtus Complaint, ¶¶ 151–152), this allegation alone says nothing about who knew this information. Rather, the In re Virtus Complaint broadly defines the term "Virtus" as VIP's affiliates and subsidiaries, which would include, among others, Virtus Investment Advisors and Virtus Opportunities Trust. Beyond that, the In re Virtus Complaint offers nothing new from what was alleged in the SEC consent order against Virtus Investment Advisors.

Even if this Court assumed these allegations theoretically supported a duty to correct claim, it is unclear against whom the claim would have been directed. Defendants seek to lump all the parties together to create the appearance that if a duty to correct arose as early as May 2013, it would have extended to both Aylward and VIP. They point to Aylward and Waltman's position in each of the Virtus entities—either as an officer, director, or control

person—to support their contention that Virtus Opportunities Trust or Virtus Investment Advisor's knowledge about the calculation errors should be imputed to each of them. They burnish that position with an allegation from the Second Amended Complaint that Virtus Investment Advisors "shared several of the same officers and directors as VIP and that VIP exercised complete control over [Virtus Investment Advisors] during the Class Period." (Opp. at 16 (citing SAC ¶¶ 25–26).)

But to "establish an inference of scienter, Plaintiff[s] must do more than allege that the Individual Defendants had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions." Lipow v. Net1 UEPS Tech., Inc., 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015) (citing In re Nokia Oyj (Nokia Corp.) Sec. Litig., 423 F. Supp. 2d 364, 406 (S.D.N.Y. 2006)). Indeed, "accusations founded on nothing more than a defendant's corporate position are entitled to no weight." City of Brockton Ret. Sys. v. Avon Prods., Inc., 2014 WL 4832321, at *19 (S.D.N.Y. 2014). An attempt to extrapolate Virtus Investment Advisor's knowledge regarding the calculation errors to VIP or Aylward's knowledge of the same would raise a bare inference of scienter leaving any complaint susceptible to summary dismissal.

Defendants also seek to import allegations from the SEC's consent order against Virtus Investment Advisors to VIP by virtue of VIP's ownership and control over Virtus Investment Advisors. But a parent-subsidiary relationship "is not on its own sufficient to impute the scienter of the subsidiary to the parent or affiliate." Valentini v. Citigroup, Inc., 837 F. Supp. 2d 304, 317 (S.D.N.Y. 2011). Rather, a plaintiff must show "that the parent or affiliate possessed some degree of control over, or awareness about, the fraud." Valentini, 837 F. Supp.

11

2d at 317 (emphasis added). That VIP exercised complete control over Virtus Investment Advisors is insufficient to impute the latter entity's knowledge to the former. What Plaintiffs were required to do, but could not at the time of the Second Amended Complaint, was plead allegations concerning VIP's involvement, knowledge, or control over concealment of the calculation errors.

II. Rule 15 Factors

"If the part[ies] seeking the amendment satisf[y] the 'good cause' standard of Rule 16, the court then determines whether the movant has also met the liberal standards of Rule 15." Kontarines v. Mortg. Elec. Registration Sys., Inc., 2016 WL 3821310, at *3 (E.D.N.Y. July 12, 2016); N.Y. SMSA Ltd. P'ship v. Town of Hempstead, 2013 WL 1148898, at *5 (E.D.N.Y. Mar. 19, 2013) ("Once the moving party has satisfied its burden of establishing that it has met the good cause standard under Rule 16, the Court must then consider whether the proposed amendment would be futile, unduly prejudicial, or otherwise improper based on the Rule 15(a) standards that otherwise govern motions to amend.") (citing Sokol Holdings, Inc. v. BMD Munai, Inc., 2009 WL 2524611, at *8 (S.D.N.Y. Aug. 14, 2009)). Thus, even if good cause exists, a motion to amend may be denied based on the existence of certain Rule 15 factors.

Although Rule 15(a) provides that a court "should freely give leave [to amend] when justice so requires[,]" Fed. R. Civ. P. 15(a)(2), even under such a liberal standard amendment may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007). Those four factors are addressed in turn below.

A. <u>Delay</u>

The issue of delay dovetails with the diligence inquiry underlying the Rule 16 good cause analysis. There are two points in time from which delay can be analyzed. The first is the date on which the Second Amended Complaint was filed—and as discussed earlier, Plaintiffs did not delay bringing their motion to amend as of that date because they did not possess the facts giving rise to their proposed amendment. The second point in time from which delay could be assessed is the moment at which Plaintiffs first learned of these facts—that is, whether they delayed bringing this motion after obtaining the SEC deposition transcripts.

Here, Plaintiffs received those transcripts in January 2017 during the class certification briefing period. Affording Plaintiffs the benefit of some time to review the transcripts, the earliest point at which they reasonably could have apprised this Court of their intention to seek amendment would have been in February or the very beginning of March. That period coincides with oral argument on class certification, which took place on March 3, 2017. But instead of seeking leave from this Court to amend their complaint, let alone providing any indication that they were in possession of new facts or intended to move at some point in the future, Plaintiffs remained silent. Plaintiffs attempt to excuse their silence during this period, claiming that disclosure would have disrupted the litigation, especially since the parties were taking discovery in tandem with the parties in <u>In re Virtus</u>.

But by waiting to move to amend until June 2017, Plaintiffs wasted the parties' and the Court's resources on the motion for class certification. Plaintiffs take great pains to characterize their decision to wait as one of courtesy. But there is, in this Court's view, a much

13

simpler explanation—Plaintiffs made an ill-advised gamble hoping for a class certification victory that would obviate the need to seek amendment.  (See Transcript dated Sept. 7, 2017 ("Tr."), at 7:19–22 (The Court: "What would you have done if I had granted your motion for class certification?  Would you be here today seeking leave to amend your complaint?" [Counsel]:  "I don't believe so, your Honor.").)

In any event, while Plaintiffs waited six months after receiving the key SEC deposition transcripts, that hiatus, by itself, is insufficient to constitute undue delay.  Margel v. E.G.L. Gem Lab Ltd., 2010 WL 445192, at *10 (S.D.N.Y. Feb. 8, 2010) (six month delay); Rachman Bag Co. v. Liberty Mut. Ins. Co., 46 F.3d 230, 235 (2d Cir. 1995) (four year delay); Block, 988 F.2d at 351 (four year delay); Richardson Greenshields Sec., Inc. v. Lau, 825 F.2d 647, 653 n.6 (2d Cir. 1987) (collecting cases where delay ranged from two to five years).  However, even if Plaintiffs' actions amounted to an undue delay, their motion to amend cannot be denied "absent a showing of bad faith or undue prejudice."  State Teachers Ret. Bd. v. Fluor Corp., 654 F.2d 843, 856 (2d Cir. 1981).  Accordingly, mere delay, without more, neither militates in favor of nor against amendment.

### B. Bad Faith

Because Plaintiffs have not been accused of engaging in any bad faith, this factor bears no relevance to the amendment analysis.

### C. Prejudice

"Prejudice to the opposing party if the motion is granted has been described as the most important reason for denying a motion to amend."  Lyondell-Citgo Ref., LP v. Petroleos De Venez. S.A., 2004 WL 2650884, at *1 (S.D.N.Y. Nov. 22, 2004).  "On the issue of prejudice, a

court considers, among other factors, whether an amendment would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute." Kreisler v. P.T.Z. Realty, L.L.C., 318 F.R.D. 704, 706 (S.D.N.Y. 2016) (citing Ruotolo v. City of N.Y., 514 F.3d 184, 192 (2d Cir. 2008)). The most obvious situation in which such prejudice arises is where the motion to amend "comes on the eve of trial after many months or years of pre-trial activity." Care Envtl. Corp. v. M2 Tech. Inc., 2006 WL 2265036, at *6 (E.D.N.Y. Aug. 6, 2006). But it can also arise where the amendment would "cause undue delay in the final disposition of the case, . . . brings entirely new and separate claims, adds new parties or at least entails more than an alternate claim or a change in the allegations of a complaint." Care Envtl. Corp., 2006 WL 2265036, at *6.

    Defendants contend they will be prejudiced because an amendment would delay adjudicating the remaining claims and result in the expenditure of additional time and resources. (Opp. at 19.) Given that the motion to amend comes at a relatively advanced stage of litigation, especially where the parties have recently completed expert discovery, the most significant expense likely to arise from amendment is revising expert reports. (See Tr. dated Sept. 3, 2017, 12:9–14 ("We already submitted a merits expert report . . . and plaintiffs now admit we will need to rip that up, do it all over again, and have wasted all the costs incurred" in preparing and filing the report.).)

    Plaintiffs counter that an amendment will necessitate "little to no additional discovery." (Mot. at 15.) But that understates the time, quantity, and scope of new discovery for an omissions-based claim that is fundamentally different from Plaintiffs' previous claim. The parties have long completed expert discovery, and a new theory based on a material omission

will, as Plaintiffs concede, substantially alter the parties' expert reports.  (See Plaintiffs' Ltr. dated Aug. 9, 2017, ECF No. 176, at 1 (amendment will "significantly alter the scope and substance of expert discovery in this action").)  The parties will necessarily incur the additional expense of revising the report, filing rebuttal submissions, and re-deposing the experts on this new theory.  Priestley v. Am. Airlines, Inc., 1991 WL 64459, at *2 (S.D.N.Y. Apr. 12, 1991) ("Undue prejudice warrants denial of leave to amend where the proposed claim will significantly increase the scope of discovery when the case is ready for trial.").  Additionally, while the scope of fact discovery may not balloon significantly, the parties nevertheless will have to re-depose Aylward and Walters, as well as the individuals from whom Aywlard and Walters claim they learned about the track record calculation errors.  This is an endeavor that exceeds the "hour or two" allotment that Plaintiffs anticipate, especially since knowledge and scienter are critical elements to explore under a new lens.  (Reply at 2.)

An amendment at this advanced stage of litigation—where both fact and expert discovery has closed, class certification was briefed once before, and the record is otherwise ripe for summary judgment or trial—would unduly prejudice Defendants.  Moreover, despite Plaintiffs' assurance that any subsequent motion practice on their amended complaint can be handled expeditiously, the reality is that there are potentially three more motions that may be calendared before this case is ready for trial—a motion to dismiss, motion for class certification, and motion for summary judgment.  And asserting an omissions-based claim to qualify for the Affiliated Ute presumption is not a panacea to the surfeit of other challenges that Plaintiffs must overcome to achieve class certification.  Defendants maintain that beyond the issue of classwide reliance, Plaintiffs' claims are vulnerable to a "a damages methodology that is [not] consistent

16

with liability in their case," proposed damages methodologies that "cannot be calculated on a class-wide basis," and proposed class representatives who are "atypical of the class and inadequate because . . . they disclaimed reliance on the allegedly misleading disclosures at issue." (Opp. at 25.) All of these issues not only risk running up the expense of this action, but substantially delaying and sidetracking it. First Mercury Ins. Co. v. 613 N.Y. Inc., 2013 WL 1732793, at *2 (S.D.N.Y. Apr. 22, 2013) ("An amendment would require additional discovery and further motion practice, including at Defendants' expense."); Gavenda v. Orleans Cnty., 1996 WL 685740, at *2 (W.D.N.Y. Nov. 22, 1996) ("This Court finds that the prejudice to the currently named defendants caused by the necessary additional discovery and the resulting increase in their related expenditures which will be incurred to properly prepare for a trial and the inevitable delay in the resolution of the dispute weigh against granting the plaintiff leave to amend her Complaint."). Accordingly, the prejudice factor weighs against amendment.

        D. Futility

Given that Plaintiffs moved to amend after class certification was denied, the "futility of any amendments must be analyzed in light of any future motions for class certification." Johnson v. Nextel Commc'ns Inc., 2017 WL 4326052, at *5 (S.D.N.Y. Sept. 19, 2017). More specifically, the "relevant inquiry is whether the proposed amendments would allow Plaintiff[s] to prevail on a renewed motion for class certification." Orthocraft, Inc. v. Sprint Spectrum L.P., 2002 WL 31640477, at *2 (E.D.N.Y. Nov. 16, 2002). The proposed amendment is futile if, "after viewing the amendment in the light most favorable to the plaintiff, the court finds the proposed class cannot be certified under Rule 23." Oscar v. BMW of N. Am., LLC, 2011 WL 6399505, at *6 (S.D.N.Y. Dec. 20, 2011). "Of course, it remains proper to deny

17

leave to replead where there is no merit in the proposed amendments or amendment would be futile." Gorman v. Covidien Sales, LLC, 2014 WL 7404071, at *2 (S.D.N.Y. Dec. 31, 2014) (citing Hunt v. Alliance N. Am. Gov't Income Tr., Inc., 159 F.3d 723, 728 (2d Cir. 1998)).

       The parties' briefs concerning the issue of futility center on the Second Circuit's interpretation of a duty to correct claim, and whether that claim, if predicated on facts that were unknown to a party at the time it made a material misrepresentation, may transform an otherwise positive statement into one of omission. Defendants offer Wilson v. Comtech Telecomm. Corp., 648 F.2d 88 (2d Cir. 1981), for the proposition that a duty to correct a misstatement that a defendant subsequently learns is inaccurate does not excuse a plaintiff from proving reliance on that previous misstatement. (Opp. at 22 ("Plaintiff's belated decision to argue their long-pleaded allegation that Index returns were 'inflated' as well as 'backtested' does not turn those returns into an omission—or this affirmative misstatement case into one involving primarily a failure to disclose.").) Plaintiffs counter that Wilson was decided long before the courts in this Circuit had occasion to clarify the contours of the duty to correct, and that recent district court decisions have since bolstered their position that a "violation of [such] duty [is] an omission." (Reply at 7.)

       The Second Circuit's recent decision in Waggoner v. Barclays PLC, --- F.3d ----, 2017 WL 5077355 (2d Cir. Nov. 6, 2017), clarified the contours of a duty to correct claim that courts in this Circuit have grappled with. By relying on Wilson, a 1981 Circuit decision that squarely addressed the issue here, the Waggoner court re-affirmed the proposition that the Affiliated Ute presumption of reliance should be applied sparingly in cases involving primarily a failure to disclose. 2017 WL 5077355, at *11. That is, "what is important is to understand the

18

rationale for a presumption of causation in fact in cases like Affiliated Ute, in which no positive statements exist: reliance as a practical matter is impossible to prove." Waggoner, 2017 WL 5077355, at *11 (citing Wilson, 648 F.2d at 93) (emphasis added).

Since its inception, this case has been about the AlphaSector Indices and their underlying track records—namely, that the Defendants misrepresented the back-tested nature of the track records and the calculations underlying them.  The Plaintiffs cannot now seek to avoid utilizing those statements by re-configuring the start of the class period.  In any event, the proposed amended complaint "alleges numerous affirmative misstatements by the Defendants.  The Plaintiffs are therefore not in a situation in which it is impossible for them to point to affirmative misstatements."  Waggoner, 2017 WL 5077355, at *11.  Simply put, the "Affiliated Ute presumption does not apply to earlier misrepresentations made more misleading by subsequent omissions, or to what has been described as 'half-truths,' nor does it apply to misstatements whose only omission is the truth that the statement misrepresents."  Waggoner, 2017 WL 5077355, at *11 (internal citations omitted).

Accordingly, since the Plaintiffs are not entitled to the Affiliated Ute presumption of reliance under their new proposed theory, amendment would be futile.

## CONCLUSION

For the foregoing reasons, in this Court's informed discretion, Plaintiffs' motion to amend is denied.  The parties are directed to provide a status report and proposed scheduling order by December 15, 2017.  If the parties believe that a conference is warranted, they should indicate that in their status report.

19

      The Clerk of Court is directed to terminate the motion pending at ECF No. 168.

Dated: December 4, 2017         SO ORDERED:
       New York, New York

_____
WILLIAM H. PAULEY III
U.S.D.J.